Ms. Morrison Thank you, Your Honors, and may it please the Court. My name is Keisha Morrison. I'm an Assistant Attorney General for the State of Arkansas, and I represent the appellant State Trooper Terral Harsson. This case concerns the State Trooper's single use of a taser to subdue a suspect believed to have fled from four other police officers at speeds over 100 miles per hour. The District Court denied both qualified and statutory immunity, and we urge this Court to reverse for two reasons. First, the District Court improperly applied a subjective standard when denying qualified immunity on Mr. Boudin's Fourth Amendment claims. The correct standard is an objective one, and if the District Court had properly applied that standard, it would have concluded that Trooper Harsson is entitled to qualified immunity. Likewise, the District Court improperly denied statutory immunity when there was no evidence of malice and no unlawful touching. Trooper Harsson is entitled to qualified immunity unless he violated a clearly established constitutional right. Now, just before the briefs were filed in this case, our en banc court filed its opinion in Kelsey v. Ernst on qualified immunity and excessive force, and I assume counsel are familiar with it, and I would be interested in your respective views of its impact on this issue. I am not sure that I know that case off the top of my head. I know that just before, or that recently, there was a case filed about excessive use of force of a woman who resisted arrest during a traffic stop, and if... How about the earlier case of Broussard v. Jahnke in 2017, a tasering excessive force case, not cited in the briefs? I regret that I'm not familiar with that one off the top of my head either, Your Honor. The law is clear, though, that use of a taser to subdue a fleeing suspect is objectively reasonable, and Trooper Harsson concluded that Mr. Bodan was fleeing based on the following undisputed facts. At the time that Trooper Harsson deployed his taser, Mr. Bodan was believed to have fled from four police officers at speeds over 100 miles per hour. Mr. Bodan did not immediately pull over when Mr. Harsson signaled him to do so, and instead he moved his motorcycle from left to right, as if he were trying to go around Trooper Harsson. What's the factual significance of the confusion about there being two riders, two speeding riders? What's the significance of that? I would assert that there is no factual significance, because even though Trooper Harsson mistakenly believed that Mr. Bodan was the first rider, he's entitled to make a decision based on a mistaken fact. And even though Mr. Bodan had only fled from two officers instead of four, he had indeed fled from two. There were two officers who were in the act of trying to pull over Mr. Bodan when Trooper Harsson came into contact with him. So once the stop occurred, what was the observation and what was the perspective of a reasonable officer that warranted using a taser at all? Trooper Harsson observed that once the motorcycle was moved to the shoulder, Mr. Bodan didn't deploy his kickstand, didn't remove his helmet, and was physically engaged in the act of jumping up and down and kicking his leg on the motorcycle, and Trooper Harsson interpreted that action as trying to kickstart his motorcycle. The motorcycle was off at the time, and Trooper Harsson thought he was trying to get it going again. And they were at the exit to go into the city of... Was there any communication between the officer and the deployment? No, Your Honor. The officer was waiting in his patrol car because he wanted to see if the other officer, the officer behind Mr. Bodan, was going to get out and effect the arrest. And when it became apparent to him that the other officer was not going to get out of his car, he decided to make sure that there was no fleeing. He went ahead and deployed his taser. An objectively reasonable officer on the scene would have concluded that based on the evasion of the other officers, their reluctance to pull over for Trooper Harsson, and the physical action that looked like kickstarting a motorcycle, an objectively reasonable officer would have concluded that Mr. Bodan had been fleeing and would continue to flee. So what's the justification for no warning? There's no case law that I'm aware of that requires Trooper Harsson to give a warning. But a reasonable officer on the scene may have believed that if he gave a warning, that would have led to flight. Sometimes the element of surprise is a little necessary. Isn't that counterintuitive? It seems like the very purpose of giving the warning is to prevent the flight. Well, a person who's intent on fleeing, when warned, would not be prevented from fleeing, perhaps would be encouraged to flee more quickly. Well, I thought this comment, if you want a taser and do it now, was Harsson talking to Howes. That's right, Your Honor. So Howes was at or approaching the site of the flight? Howes was part... And what did Howes testify as to why he didn't taser him or whether he gave any warning and so forth? Howes testified that he remained in his car because he thought Trooper Harsson was going to get out of his car, and Officer Howes testified that he saw Mr. Bodan engaging in some sort of physical action Trooper Harsson described, and that he also believed that he was about to flee. You're saying Howes didn't get out of his car either? There was a confusion about who was going to get out and complete the arrest. There was a need for one officer to stay in their car in the event that he fled, so that one of them could be ready to pursue if he took off on his motorcycle. So then Harsson was the first one to get out of the car, out of the control car? That's right, Your Honor. And he approached and tased? Yes, Your Honor. When analyzing qualified immunity, the District Court did not focus on these undisputed facts. Instead, it focused on Mr. Bodan's assertion that he wasn't actually trying to flee and he was just trying to get his motorcycle in neutral. But that's not the proper analysis under the Fourth Amendment. The touchstone of the Fourth Amendment is objective reasonableness. And even if Mr. Bodan was not trying to flee, the question is whether a reasonable officer on the scene would have concluded that he was. And the District Court should have considered the evasion of other officers and the reckless driving and the reluctance to pull over for Trooper Harsson, and it should have concluded that an objectively reasonable officer would conclude that Mr. Bodan was fleeing. Additionally, the use of force was appropriate here because if Mr. Bodan fled, it would have posed a danger to Mr. Bodan and to the officers involved and also to the civilians on the scene at the time. Moreover, the type of force used was reasonable. This Circuit has held that police officers may use force, including a taser, to subdue a fleeing individual, which is what Trooper Harsson did here. And he deployed his taser only one time, only the amount of force that he believed was necessary to effect the arrest. And then he immediately placed Mr. Bodan in handcuffs. No other force was used. And in fact, he was careful to make sure that no additional injury came to Mr. Bodan. He didn't remove the taser prongs himself because he felt that that could lead to injury. The taser, additionally, was the safest way to ensure that there would be no high-speed chase. Harsson could have been run over or dragged if he attempted to physically remove Mr. Bodan from the motorcycle. And additionally, there's no guarantee that a lesser degree of force would have brought Mr. Bodan under control. Finally, while not dispositive, Mr. Bodan's de minimis injuries are further evidence that the amount of force used was not excessive. Mr. Bodan suffered some minor bruising and temporary aches and pains and cuts from the taser prongs, but he produced no medical evidence of ongoing serious injuries. And his ER report showed no serious injuries. In fact, he rated his pain as a 2 on a scale of 1 to 10 on the day of the incident. The hosting council's brief says there was no radio traffic between the pursuing officers, but I got from your brief that Harsson was aware of these other chases. Yes, there's a dispatch record. He didn't see House immediately behind Bodan because House had encrusted the hill. That's correct. What's the record on the communication between the various pursuing officers? There's a dispatch record that shows that there had been some communication. It doesn't transcribe all of the communication that had gone on, but there is evidence in the record that they had been communicating via dispatch. What did Harsson testify? How many pursuing officers was he aware of? Four. And before he approached Bodan? Yes, sir. And how did he get that information? From each of them? Yes, he was hearing all of that over his radio. He heard the first officer over the radio indicate that she was pursuing. If I may briefly wrap up and then preserve some time for rebuttal. Even if this court concludes that the use of force was excessive, Trooper Harsson is still entitled to qualified immunity because there is no existing precedent that would put him on notice that his behavior was inappropriate. Additionally, because Trooper Harsson had probable cause to arrest Mr. Bodan and because the right to make an arrest carries with it the right to use some force to carry out the arrest, there was no unlawful touching and there is no evidence of malice, especially when considering the totality of the circumstances. And for those reasons, the district court should be reversed because Trooper Harsson is entitled to both qualified and statutory immunity. So you think it's sufficient that the officer believed flight was imminent versus a suspect in actual flight? Yes, Your Honor. I would assert that it is safer to tase a suspect before he actually is in motion. If Mr. Bodan had actually taken off and then been tasered or otherwise force used against him, that would have caused a great deal more injury. Thank you. Thank you. Mr. Healy. Good morning, Your Honor. Floyd Healy for the appellate along with Mr. William Ables. I'm representing Jeremy Bodan, the appellate in this case. Your Honor, I don't believe we have any issues with the law as stated. I think the law is fairly clear on the two-pronged test. Nobody cited our most controlling recent cases. My apologies, Your Honor. I was trying to get one of the older cases that had been around for a long time. The Supreme Court has at least half buried them. Regarding the issue of excessive force? Qualified immunity, at least. Yes, sir. Judge, I am not familiar with that case. What is that case? The Supreme Court has had four or five in the last decade on qualified immunity and clearly established. Then we have Kelsey v. Ernst in Bank, which is the controlling authority in August of 2019. Judge, I do admit that... I authored Grosser two years ago and that was a tasering, successive taserings of defiant father and son. Yes, sir. Judge, I am not familiar with those cases. The son was cuffed and in a police car and he ignored a command to move over. And was tased. And was tased as a result of failure to... For that reason and we affirmed the decision for the defendant. Allowing that the taser... Noncompliance in that case in a hostile or previously violent situation. Judge, I don't believe... Continuing noncompliance warranted tasing. That seems not too far off from someone who's... The police believed has now eluded four different officers. In fact, he only eluded two. Judge, Mr. Bodin had not believed that he had eluded anybody at the time he was stopped. That's not the focus for qualified immunity. No, sir. I understand. But if the... If they're going to say that the... That officer... Excuse me, former officer Harsin was relying upon that information. There's some inconsistencies as to what happened subsequent to the stop. In your brief there... Your brief says there's no radio traffic exchange between any of the officers who engaged in the pursuit of Mr. Bodin that he was attempting to flee the scene. Correct. And that is correct. Sir? Are you saying counsel was wrong when... That Harsin said he had listened to all the dispatches? I'm not arguing what happened prior to that. But prior to Mr. Bodin leaving the Walmart, I'm talking about once he was stopped. Once the video picks up. We got him here at the 55 Getoff. There's no radio communications from any of the police officers. Hey, this guy's trying to flee. Hey, this guy is dangerous. Hey, this is the guy that was riding up and down the highway. None of that. We have a statement. And the statement isn't, if you want to tase him, now's the time to do it. The statement is, and the court can certainly verify this by looking at appendix 180, which is the video. And I apologize. There was no other videos. We asked for it in discovery. We asked for it FOI. And we were told that the other officers who arrived thereafter erased his video. So the only video that we have is what the court has been provided. But it states, anything? Yeah, we got him here at the 55 Getoff. We got him here. That doesn't imply that this guy is jumping up and down on his motorcycle. Did Bodin hear this? This is on... If you want to tase him. And the statement came right after, we got him here at the 55 Getoff. Was this a radio? We now, I now learned this morning, neither officer was out of his car. When that was, so did Bodin hear that? Because was it yelled? Or was it over their radio? Bodin did not hear that. Bodin was sitting on his motorcycle. Was it radio or what? It was radio traffic, your honor. I know your brief says there was no radio traffic after the stop. There was no radio traffic regarding his attempting to flee. Well, Howes was there. Howes was the pursuer and he had arrived. Correct. But when the colloquy that goes on, on the video, there is nothing from Officer Howes or the defendant in this case that Mr. Bodin was anything other than a person being stopped for speeding. Well, isn't the logical inference that what, I don't know how he explained it, but Harsin is saying you've been chasing this guy, you finally got him. If you want to tase him, now is the time. The statement was if you want to taser him, taser him. Yeah. Why would he say that to Howes except for the fact that Howes had been pursuing the plaintiff at over 100 miles an hour for some distance? Your honor, I have no explanation as to that. Why he would make that statement when Mr. Bodin was, at this point in time, was a non-violent misdemeanor at best. He was speeding. That was true in the Brossard case, too. The guy having caused all kinds of trouble was now in custody in the car. Right. But that statement was made and then both officers sat in the car for well over 24 to 30 seconds depending on when you start counting. I started counting from the time he said, if you want to taser him, taser him. And to me, that reeks of malice. That reeks of this is your time to get even with him and teach this little punk on a motorcycle. Is it undisputed that the plaintiff was making the kicking motion with the left leg? Your honor, that is very much disputed. And that is one of the disputed facts that Judge Wilson indicated in his order that needed to be determined. The motorcycle was not running. And the motorcycle is an electric start motorcycle. There would be no reason for him to be jumping up and down trying to kick start a motorcycle because that motorcycle doesn't even have a kick start. And Harson knew that? Harson said that he'd been around motorcycles for his entire career, but basically he said he didn't care for motorcycles. I thought Gordon admitted he was moving his leg up and down. He was moving his left leg up and down trying to take his motorcycle between first and second gear and neutral so that he could put the kick stand off, get off of his bike. So why couldn't a reasonable officer perceive that as being an attempt to put it in gear to flee? Well, number one, the motorcycle wasn't running. Number two, there had been a significant length of time, a delay from the communication, if you want to taser him, taser him. I guess if Mr. Bodin was trying to flee, that would have been the appropriate time to do it. Did Harson admit knowing that the motorcycle was not running? I believe he said that he did not know if it was running or not. And I believe I did ask him that question. He said he just didn't know if it was running or not. Isn't fleeing by vehicle a felony? I believe fleeing by vehicle, depending on the circumstances, Your Honor, yes, in Arkansas that would be considered a felony. And that's why we had these safeguards in place because at that point in time, under the appellant's argument, anybody on a motorcycle on Highway 67, 167 North was a potential suspect. Mr. Bodin did not have on a black jacket. There's some subtle distinctions, but I could understand or one could understand why this guy was, maybe this could be the right guy, maybe not. But, you know, under those circumstances, with that long delay, with the fact that we got him here at the 55 getoff, the statement was, well, we think we got him, but the kid's jumping up and down on his motorcycle, you know, calling for backup, this kid's going to bolt. Mr. Bodin never bolted. He never tried to pass, as the Court will note in the video, he never tried to pass that vehicle. He thought that he was being stopped for speeding, and he tried to get in front of Officer Harson because that's where most people normally stop for speeding, but he ended up pulling in behind him, gets off his motorcycle. The motorcycle is not running. It had either died or had been turned off, but it was not running. And, yes, he could have started it up within a matter of, certainly within 24 seconds. He could have been in the next county by the time these officers got out of the car. He had no reason to do any of that. At that point in time, he had done nothing more than gone over the speed limit. Should there have been a warning? Perhaps. I don't know. Maybe get off your motorcycle, but you can hear on the video the taser being shot and Officer Harson ordering him at that point, off, off. Kind of like bang, bang, halter, will, shoot. To me, it's the way it was said, the time it was said, and the delay under which it was said. It's retribution. This is not a lawful means to effectuate an arrest. What reason did Harson have for retribution? Because this gentleman, maybe Harson thought this gentleman was toying with the police. He was intimidating the police. They had been chasing this gentleman who still hasn't been. Not they. Harson was parked by the roadside. No, no. But Harson was aware. He didn't know any of this stuff. He knew that this somebody had been avoiding police officers since 5 o'clock that afternoon and actually long before then. And this was payback time, Your Honor. That's all it was. It was payback time. Jeremy Beaudet is all of 5'4", 140 pounds. Officer Harson is 6'3", 240 pounds and well-armed and well-equipped. You know, to allow this type of constitutional deprivation to avoid what ifs. You know, what if he had gone into the city? What if the police had followed him? You know, what if a group of nuns stepped out in front of him and everyone was killed? That's not the case here. And we're not talking about what ifs. We're talking about what actually happened. And my client was tased. 20,000 volts of electricity. He had to go to the hospital. One of the probes was within millimeters of his carotid artery. It had to be surgically removed. You know, de minimis injury. I don't understand that whole line of cases or that mind thought. If I pull out a weapon and shoot somebody and try to hit them in the head and it grazes them, you may have a very minor injury, but that doesn't take it out of the use of a deadly weapon. His injuries were not life-threatening. They weren't permanent, but they were certainly severe. Officer Harsin even testified during his deposition that as part of his job, he had to be tased and it was extremely painful. Left scarring on his body. But we have fact questions, Your Honor, and that is what was Jeremy Bodin doing from the time that he was stopped by Officer Harsin until Officer Harsin got out of the car. That's a factual dispute. It's not a legal dispute. It's for the jury to decide, was he trying to flee? Was he actually engaged in something that a reasonable, objective officer could determine was an attempt to flee? Is there objective evidence refuting Harsin's claim that he believed or was fearful that the leg movement was to kick-start the fight? Absolutely, Your Honor. The delay of 24 seconds. If I'm a police officer and I feel that someone is fleeing, I'm not going to sit around for 24 seconds and decide what I'm going to do. I'm going to jump out of my car and try to correct the situation immediately. That is a significant gap. And it also takes us out of the split-second decision that officers are often faced with. This guy had up to a half a minute to decide, well, am I going to tase this guy or am I not going to tase this guy? He was going to tase this guy because he had predetermined in his mind when he said, if you want to taser him, taser him. He didn't say, now is the time because his back is to you and you can hit him in the back and it's going to be safe. Therefore, he's attempting to flee. That is not the statement. The statement is, if you want to taser him, taser him. It's payback. That's all it is. It's payback. Who made that statement and to whom was it made? The defendant, Terrell Harson, made that statement to Officer House, who was the officer who had been pursuing Mr. Bodin for a mile or so. He made that statement. Officer House said, we got him here at the 55, get off. Harson immediately states, if you want to taser him, taser him. Isn't that statement totally irrelevant, though? I mean, doesn't that go to the officer's subjective intent? And aren't we really dealing with an objective reasonableness test in this case? Well, I think that we are given the advantage of knowing what he was thinking and knowing what he was planning to do. I think we can take that out of the objective standard. If it's otherwise reasonable, does it really matter what he said? I think it does matter. It shows malice. It shows intent. It shows a forethought. That's state law. That's not qualified immunity law. Yes, sir. I think we still have an objectively reasonable officer would not have done it under these circumstances. If an officer thinks that someone is fleeing and has fled and can flee. That may or may not be. But my point is the statement just doesn't matter to the analysis. Your Honor, I respectfully disagree with that. Because I think that his statement puts everything in context as to what he was going to do. What case supports your disagreement? We have 43,000 of these cases. What case makes, despite the Supreme Court saying this is an objective inquiry, what Eighth Circuit case makes relevant that statement? Judge, I'm not aware of any. I'm just saying. I'm not either. Right. And if there was one, I'd hope I would have argued it. But, Your Honor, I see that I'm out of time. The issue here on this interlocutory appeal is whether or not there were factual issues that remain for a jury to decide. And there certainly are, as our discussion has indicated today. And for that reason, I'd ask that the decision by Judge Wilson be upheld. Thank you, Mr. Heath. Thank you for your time. Ms. Morrison. Thank you, Your Honor. Your Honors are exactly correct that neither Trooper Harsin nor Mr. Bodan's subjective intent or motives have any place in this objective reasonableness inquiry. Mr. Bodan's knowledge of whether he was being pursued is irrelevant, because the question is whether Trooper Harsin could have concluded that Mr. Bodan knew he was being pursued. And because the officers were behind Mr. Bodan with their lights on, a reasonable officer would have concluded that he knew he was being pursued and was fleeing anyway. There are two factual things that I wanted to clear up. First, counsel for the appellee asserts that the kicking motion is disputed. It's undisputed that Mr. Bodan was physically moving in the way Trooper Harsin described. Mr. Bodan admitted in his deposition that he was moving in that way, and he explained that he was just trying to put his motorcycle in neutral. But Trooper Harsin didn't know that at the time, and a reasonable officer certainly could have concluded that he was trying to either start the motorcycle or put it in gear to take off. Second, the issue of 24 seconds. Well first, let's consider what all was going on during that 24 seconds. Trooper Harsin is on the side of a busy highway, it's almost an interstate, and he was watching Mr. Bodan physically taking these actions that looked like kick-starting a motorcycle, and he was making the decision whether to keep waiting for the other officer to get out of the car. Trooper Harsin testified that it felt like mere seconds to him. So 24 seconds may seem like a long time, but it was not a long time in the moment. It was objectively reasonable for Trooper Harsin to conclude that Mr. Bodan was fleeing and would continue to flee, and for these reasons we ask the court to reverse the district court's decision as to both qualified and statutory immunity. I'm out of time, but I would entertain questions if you have any. I see none. Thank you. Thank you, Ms. Morrison. Thank you also, Mr. Healy.